Let me call our last case, Interactive Communications v. Great American Insurance. Good morning, and may it please the Court. Your Honors, Incom purchased a crime protection policy from Great American Insurance Company to provide coverage for exactly what occurred in this case. Individuals manipulated Incom's IVR computers and caused a transfer of money from Incom's own account to somewhere else. The policy language calls for coverage in this case, and it is, at the end of the day, relatively straightforward. Can I maybe ask you to start at the end of the argument with the occurrence issue? I don't want to knock you too far off your stride, but if you don't mind starting there, can you explain to me? I certainly understand that under the language of the policy, it's not the actors that need to be related. It's only the act that need to be related. But how is it that these acts were related? They weren't really related in time so much, right? This occurred over several months in place. This occurred over numerous states. So how is it that they were related? Your Honor, the acts are related, and you're correct. The policy language here talks about an act or event or a series of related acts or events not involving any identifiable person. Here, the acts are related because it is the exact same method that was used to cause the fraudulent transfers. In this case, the loss was caused by the IVR, and the IVR is the mechanism by which someone dials in and then enters the codes in response to the prompts they receive to activate the CHIT so that they can put money into their account. Here, they're related when you look at how it all occurred. It wasn't one person here doing it and then someone else doing it and someone else. They were simultaneous redemptions at multiple times. They're related because the method that was used is the exact same. And as we've cited in our papers, when talking about occurrence and talking about the related acts and thinking about the occurrence, the proper test is the causation, and the court should be focused on the cause under Georgia's Supreme Court precedent of the occurrence of the loss. And the cause here was this multiple simultaneous redemptions over and over and over again. And, Your Honor, while they did take place over time, the record does indicate that the vast majority of them, and importantly from a significant financial standpoint, occurred over a relatively short period of time. So I think I understand that they are similar, and I'm trying to decide if whether being similar is enough to make them related. And if the only relation is that the fraudsters exploited a common code weakness, then I really wonder about the reliance on the cause cases because the cause of the fraud – I mean, this is a computer fraud policy, not a product defect policy, right? And so the cause of the loss was the fraudster's intent, right, not the underlying code error. I mean, if this had been sort of a glitch that caused money to go into every other account in the world or whatever, then I can see how the reliance on the cause cases might make these related. But because these are fraud claims and brought under a computer fraud policy, I'm having a tougher time finding that they are related instead of just similar. Two things, Your Honor. First, the phrase computer fraud policy gets thrown around quite a bit, and it is titled a computer fraud policy. But the policy itself, the operative language from Insuring Agreement 5, doesn't say the fraudulent use of a computer. It says the use of a computer to fraudulently cause the transfer. So we do need to focus on the cause, and this is why all of the acts are related because it is a – you're exactly right. We've used the term software error, glitch, whatever we want to call it. It's a similar concept as it relates to the IVR, but it's unquestioned that the IVR was not being used in its intended fashion. And it's unquestioned that every one of these multiple redemptions was whether we call it unlawful, fraudulent, criminal. Everyone in this case agrees. That is how they are all related. They're not just similar. It is one single cause. So Your Honor, respectfully, would point out that those causation cases do need to be considered when considering whether or not this is a single occurrence or multiple occurrence. So just explain to me one more time, and I'm sorry if I just missed it there in your explanation. But I think of fraud as sort of an inherently individual course of wrongdoing. And there might, I guess as you say, have been some kind of coupling up of fraudsters here, but there was no sort of grand conspiracy. So why wasn't the cause each individual's fraudulent state of mind ultimately? One, Your Honor, you could look just at the language, the policy language itself when figuring out if there's an occurrence. If we had to establish, and if the insured under this policy had to establish that it was this person's criminal intent or fraudulent intent or the next person or the next person, then we couldn't have the policy language that says not identifying any identifiable person. That would be putting language and terms into the policy requirements into the policy that are just not there. And again, while we're talking about fraud, while that word is used throughout this, this is not a fraud case. We're not suing for fraud. We didn't sue someone else for a fraud. And it's a computer fraud policy, but it refers to the fraudulently causing a transfer of property. And here, Your Honor, to go to the next step, if we had to, there's no question in this case that these individuals were conducting fraud. How? The chit is designed to be redeemed one time. If I go to Walgreens and I buy it and I spend $100 to put on my card, I get to use that $100 one time. I don't get to put it in over and over and over again. Everyone agrees that's what happened here. Great American's own adjuster called the conduct criminal. Their consultants said this was unauthorized. So there certainly is that aura of fraud surrounding all of this. And we've got to keep in mind also that the only reason someone dials the IVR in this context, there's one reason and one reason only, to redeem the chit and put money into your account. So we have multiple people doing it over and over again at the same time, clearly inconsistent with its intended use. So, Your Honor, respectfully, while it's not a fraud case per se, we need to focus on the policy language and where fraudulently cause of transfer occurs. And even if you want to dig into what the individuals were doing, when you consider what Great American has said about it, when you consider that the FBI and Secret Service investigated this, when you consider the method and manner in which this scheme occurred, it all screams of fraud or illegal activity. Let's talk about the other issue, use of a computer and whether it should be interpreted to incorporate or include a debit reload, a debit card reload executed through INCOM's phone-based system. Why, under the circumstances of this case, should we not view the use of the phone as being essentially part of the computer? Because it's different, Your Honor. Well, it's different. It is different. A mouse is different from a computer, and a keyboard is different from a computer, right? Correct. And a monitor is different. Correct. Your Honor, I would also say that a Wi-Fi access is different than a computer. The policy language dictates here says use of a computer. It doesn't say how you have to use the computer. It doesn't say I have to sit at my desk. It doesn't say I have to sit on my iPhone. It doesn't say it can't be if you have to access the computer by telephone. And that's the position, erroneously, we think the district court has taken and what Great American has as well. I think the analogy of Wi-Fi is the best. We could go to the extreme and say electricity. I can't use a computer if I don't have some, either Wi-Fi connection or electricity. Does that mean, in this case, in these circumstances, that, oh, well, you didn't use the computer. You used Wi-Fi to access the computer, and that's an added step. That's what the district court did here. This unquestionably, everyone agrees that the IVR is a computer. There's no dispute of fact about that, and that's what these individuals used. The way they accessed it, from our view, really is totally irrelevant to the issues in the case. The third issue that I would like to address, Your Honor, is the language resulting directly in the policy. That is the key legal question in the case. As the briefs have shown and was shown at the district court, the parties have litigated this for a while and have gone back and forth and showed various district court cases and court of appeals from around the country that have looked at this language or similar language and applied different approaches to it. Some courts have found a more stricter interpretation of resulting directly, saying direct means direct. Others have said it's more lenient in the context of an insurance policy like this, and it's a proximate cause. Either way, there's coverage under this case. The district court cited cases and relied principally on cases that pointed to the direct means direct. Interestingly, the district court quoted from Black's Law Dictionary and says direct means straightforward or in an arrow. If you looked at what happened in this case, that's exactly what we have. We could go into the debate about, under Georgia law, which one applies, and as this court looked at in the St. Paul case, when there's confusion or two reasonable interpretations under Georgia law governing the interpretation of insurance policies, the insured gets the benefit of that, and it's construed in favor of the insured. But here, regardless of that, just looking at the facts, it's straightforward. Manipulation of the IVR, and then INCOM follows its normal business practice, believing that these were legitimate transactions, and transfers money outside. That's not a situation like many of the cases that have not found coverage here, where we have a lot of intervening steps, where we have an email, and then maybe a follow-up telephone call, and then maybe some canceled checks, cases such as Pestmaster and others. But in this case, and what distinguishes this case from those that have applied resulting directly but have not found coverage, is that the computer was central and necessary to this. In the other cases that have looked at a resulting directly approach and have said, well, it doesn't apply here, they have found other intervening facts, and they have found, importantly, that the use of the computer was merely incidental to the fraud. Here, this whole scheme could not have been conducted without the IVR. The whole purpose was to redeem the chits multiple times to allow money to go into their accounts. But so I guess when I looked at it, I don't think our definitions are meaningfully different, but when I looked at the definition of direct or directly, I found without anything intervening, straightaway, next in order, without delay, immediately. And this, you're right, I mean, this isn't like a Paul's graph kind of Rube Goldberg apparatus, but, I mean, there are a few intervening steps, right? I mean, the card is loaded, step one. Your client transfers money to Bancorp, step two. The cardholder makes a purchase, maybe that's step 2A or 3. And then the Bancorp issues the money to the merchant. That's really when the loss occurs, right, when Bancorp pays the merchant? Your Honor, the loss occurred immediately when Great American transferred its money to Bancorp. So I would disagree that there are really multiple intervening steps. I don't disagree with your timeline, Your Honor, but I do disagree with the way the facts apply to the causation argument and to the timing of loss. But now, isn't there some evidence that even after the transfer from you to Bancorp, that you were able to claw some money back or to prevent it from going out before what I'll call step three, before Bancorp pays the merchant? Your Honor, I'd like to answer that question. My time is up. May I? Please. Thank you. Okay, so we're talking about the $1.9 million that is related to these activities and still sits in the Bancorp account. Incom wears two hats in this. First, in connection with the funds flow that we've talked about, they wear a separate hat regarding the use of the cards in the marketplace, the individual reloadable cards that is different and separate from the funds flow. And you've probably seen in the papers, it's their role as program manager. The best example I can give is this. If you lose your debit card or your American Express card, you dial an 800 number and you talk to someone. In this case, with the reloadable card, you're talking to someone at Incom. And you say, I've lost my card. I need you to stop it, freeze the use of the card. That's essentially what they were able to do here. But that is just to stop the use of it once the fraud was discovered. And as a result of those actions, they weren't clawing money back. They were freezing the use of those cards. I would have thought that the better interpretation is that the loss occurred only when the card issuer transferred the funds to a merchant to fund the purchase made with a duplicated chip reload account balance. I would have thought it's when the merchant, let's say, bank pays the merchant. That's when the loss occurred rather than in one of these intervening steps. Your Honor, that's what the district court found. But specifically, the loss found, when you look, we start by looking at the policy language. The loss occurs when the money is transferred from Incom or Incom's banking premises to somewhere outside of Incom. And that is exactly what happened here. The Incom money was sitting in an Incom Wells Fargo account with an Incom tax ID number. And then after these chips were redeemed multiple times, Incom followed its normal practices, believing these redemptions were legitimate, and transferred money into a Bancorp account. Now, that Bancorp account is an FBO account for the benefit of, and it is held for the benefit of the cardholders. Bancorp, it's a separate account. It's a Bancorp-controlled account. It's got a Bancorp ID number. Incom has no right to go and take that money. It's not like it was transferring it from its checking account to its savings account. It was transferring the money from its own account. So to say the analog is closer to a check or a negotiable instrument that might be fraudulent, the funds would be lost only when the bearer cashes the check or exchanges the note for value. Your Honor, in this case, it's different because— So that analog is no good. It is not because these specific accounts are held for the—let me back up, Your Honor. Think of it in the normal course, absent any fraud. The money is sent to the Bancorp account, and if I have a vanilla reload card that I want to go use that night at dinner and I have $200 in my account as that cardholder, I think that's my money because it is my money. Because someone's holding it for my benefit, it's not Incom's. Okay, let me break it down this way. As I see the pieces in the transaction, the following comprises how and when the loss is sustained. Tell me, as I go through step by step, where the loss occurs. Customer receives a prepaid card from an issuing bank. Let's call that step A. To add value to the card, the customer purchases a chip, a chit. Let's call that B. Sometime later, after the purchase, the chit seller wires the dollar amount of the reload to Incom's bank account. The customer redeems the chit, either online or by phone, making the dollar amount of credit immediately available for use on the prepaid card. Let's call that D. After the chit is redeemed, Incom wires the amount of the redeemed funds to the card issuing bank to be held for the use of the customer. Once a purchase is made with the funds, then the merchant will be compensated for that purchase by the card issuing bank. That's the sequence, right? Yes, Your Honor. But I would have thought the loss occurred when, let's say, Bancorp pays the merchant for goods that were, and that's the time of loss rather than in one of these earlier iterations. Your Honor, the loss occurred before that. So where did the loss occur given I laid out for you six steps? I believe it's step E, Your Honor, where Incom transfers the money to the Bancorp account. When the customer makes the $100 purchase with a debit card? No. Before that. That's too late. Before that. When customer calls Incom to redeem $100, and $100 immediately becomes available on a debit card after the chit redemption? The step in between, Your Honor, when Incom wires the money to the Bancorp account. Got it. One last, and then I promise I'll let you go. There's an issue, of course, about the transfer from what I'll call inside the banking premises to outside the banking premises. Did the transfer and the loss in your mind have to occur at the same time, or could the transfer occur at Judge Marcus' step C or D, the transfer you were describing from Incom to Bancorp, but the loss nonetheless occur at a subsequent phase when Bancorp pays the merchant? Your Honor, they're one and the same. I guess I have two responses. They're one and the same here. When we think about the transfer, we're talking about the transfer of ultimately the $10 million plus that went from Incom to the – from the Incom Wells Fargo account to Bancorp. If the loss occurred later, then we would get into an entirely different causation argument, and in that situation – I know I'm getting off for a little bit, but in that situation we'd start talking about the proximate cause analysis because it would be further down, and our view is if the loss occurred at that point in time, it would still be covered under the proximate cause analysis in these cases. Okay. Thank you. Thank you. Good morning. Good morning. May it please the Court. To answer the question of when the loss occurred, it absolutely occurred, to Incom at least, at the moment that money was taken from the cardholder account to reimburse merchants for transactions that had already occurred. In this case, we actually have facts that demonstrate that Incom did not suffer a loss until that point because there's $1.9 million still today sitting in the cardholder account. Incom says that that money doesn't belong to it, but if it doesn't belong to Incom, who does it belong to? It certainly doesn't belong to cardholders because the whole point of the claim is that the cardholders – At the moment that the card issuer transferred the funds to the merchants to reimburse them because that's the first time that the money has gone to somebody who's not entitled to it. At all other steps, it's either in Incom's pocket or it's in a trust account that's being held by Incom's business partner.  Because of the direct as opposed to maybe the proximate cause? Yes, that's precisely why it matters. Because without – the real cause of the loss at that point is when somebody takes the card that's been reloaded, goes to a merchant, and buys a TV or a stereo or whatever it is they use it to buy. That's the first time that the people who engaged in this activity got any property from anybody. So one way to look at it is that the first loss really is incurred by the merchant who hands a TV over to the individual who's using the card. Then Incom ends up through a series of contractual obligations and transfers is left holding the bag. Because of their contractual obligations, they have to reimburse ultimately the merchant. And so that's why it's important to determine when the loss is because that's how you analyze the causal connection. Is it direct? So if we were to just apply normal proximate cause law, you would be wrong. You can only win and we can only sustain the district court on the theory that resulting directly from means proximate cause plus. There's a directness and an immediacy that goes beyond traditional proximate cause analysis. Do I have that right? No, I disagree with that respectfully, Your Honor. Even under proximate cause analysis, I don't think that there's a sufficient causal connection between the initial telephone calls that were made to the subsequent reimbursement of the merchants. And the reason why is if but for the subsequent intervening event of this individual going into a Best Buy and purchasing a TV, the money is still sitting in the account and Incom is able to retrieve it. They have a contractual right to retain the funds in the account. So that purchase at the Best Buy in that example broke the causal chain sufficiently. I thought that the approach, certainly the one employed by the district court here, was something like what the Third Circuit did in Jefferson Bank versus progressive case insurance. Are you familiar with the case? In that case, the Third Circuit says the phrase resulting directly from does suggest a stricter standard of causation than mere proximate cause. The words imply that the loss must flow immediately either in time or space from the alleged covered conduct. Direct means direct. It means something more than a sequence of events. That's correct, Your Honor. And I believe that that is the proper interpretation of the language. But that's more than just proximate cause. I just name it for convenience, proximate cause plus. You can call it direct cause, immediate cause. But somehow it bespeaks something more and a higher burden than simply proximate cause. Do I have that right? Or have I misapprehended this? Yes, that's absolutely correct, Your Honor. The word direct is in the policy because everybody knows, every layman knows what direct means. A direct connection is one thing connected to another with nothing in between, which is the dictionary that Judge Newsom, dictionary definition Judge Newsom read bears that out. So if there are three intermediary steps that are necessary before the loss can be consummated, that's not direct? That's correct. Moving on to the other issues with respect to occurrence has to be a series of related events. Everybody agrees on that. What is related, typically what the cases in the area of fidelity insurance, fidelity and crime insurance have looked to, those applying the cause theory that Georgia has adopted, is one of two things. Either number one, how many transactions are there? If that is the test in this case, we've got more than 25,000 separate occurrences because that's how many phone calls were made to redeem these chits. And the amount, the largest amount is well under the deductible of 500,000. The second thing the courts look to is the state of mind of the actors. So if there's one actor who is committing fraud, a scheme of fraud that involves 27 separate transactions, for example, that could be viewed as one occurrence because it's one state of mind by one dishonest actor. And that could also be applied in the case of a conspiracy with a number of actors who are colluding together. If that's the case, there's still multiple occurrences, none of which exceed the deductible in this situation because there's not been, as far as from the record, the INCOMS never identified a single person who we know was actually involved in redeeming these chits. There are individuals to whom the cards were registered, but INCOMS corporate representative admitted that those individuals may have been the victim of identity theft and there's no reason to believe that they were actually involved in the conduct. And even if they were, none of them were involved in any transactions where the aggregate amount exceeded the $500,000 deductible. So the only thing that INCOMS pointed to is the method that was used by these actors to redeem multiple chits, but method, using method to say that events and acts are related to each other would lead to absurd results. The example is with respect to a retailer. These policies were initially designed to cover employee theft, which is the largest risk to any employer. And so take the example of in 1950, a McDonald's employee in California takes a dollar bill from the till, puts it in his pocket. Fast forward to 2017, last week, an employee at a McDonald's in Atlanta puts a dollar bill from the till into his pocket. Under INCOMS theory, both of those transactions would constitute a single occurrence, and that's an absurd result. And it would actually, in practice, if there was an opinion that applied that, it would do more harm to insureds than not, because if a large company had multiple employee thefts over the course of, let's say there's a three-year policy and they've got employees all over the country engaging in petty theft, now those are all one occurrence subject to one limit of liability, whereas if they're viewed as separate occurrences, they, sure, they're each subject to the deductible, but there's not a cap on the total amount the insured can recover. So that's why it would lead to an absurd result to say that all of these, everything's connected if these actors use the same method. Finally, the final issue that I want to address is with respect to the use of a computer. The district court reached what I think is a common-sense conclusion, at least, that using a phone is not the same as using a computer. Is using a keyboard the same as using a computer? It's certainly closer. Is that a yes or is that a no? That's a yes. All right, if a keyboard is the functional equivalent of using a computer, why wouldn't a phone mouthpiece or a phone keypad that can input a device be the same thing? Speech recognition software has become much more common. A smartphone hands-free command technology, among other things, allows a computer device to be controlled through speech. So if the way the computer is set up, I get on the phone and I either punch in a number and the computer takes that as the command, or it recognizes my voice, which is the functional equivalent of punching in a number on the telephone, or punching in a number on a keyboard, where's the difference? Well, the difference, I think a useful way to draw the distinction is what is the device designed for primarily and how is it connecting to a computer? In the case of a keyboard, for example, a keyboard is designed for the specific purpose of providing commands to a computer, and it's usually if you go to the store and buy a computer, the keyboard is packaged with it. In the case of a laptop, you can't take them apart, at least, without destroying the computer. At least, I couldn't. But functionally speaking, isn't it the same? Whether I type onto a keyboard, I give a command, the computer has software and it spits out a result, or I use my telephone and I type in a number just as if I had typed it in on a keyboard, it gives a command to the computer, the software is constructed in such a way as to spit out the same command. I'm having trouble seeing the difference other than I typed the command into a keyboard, or I typed the command into the numbers that appeared on my smartphone. I think the difference, at least with respect to the phones that were used in this case, and we don't know if they were smartphones or rotary phones or what have you, but I think the real critical distinction is that these phones, before they were providing any kind of commands or communicating with a computer, had to pass through the airwaves and public utilities, I assume. I'm not a telecom person, so I don't know exactly how that works, but they had to pass through phone lines and, I assume, switchboards and all kinds of things of that nature before InCom answered the phone call with a computer. It wasn't an instance of an individual with speech recognition software, for example, who has set up his computer specifically so he can provide, because he wants to provide prompts to a computer. The choice was InCom's to answer the telephone call with a computer, not the consumer who's using his own personal phone that he's not done anything to connect to a computer. So, unless the Court has any further questions for me, I'd like to finish. I have one question. You just made an argument regarding the multiple separate occurrences and none of them exceeding the $500,000 deductible. Was that issue addressed by the district judge? No, it was briefed fully in summary judgment, so there's a full record, but the district judge did not address it in the opinion. Thank you. And you've reserved your full three minutes, Mr. Dithley. Thank you, Your Honor. Just three follow-up points. First, on the issue of this $1.9 million, that is not evidence of the time of loss. As I mentioned, that is what sits as a result of InCom, after they discovered this, being able to stop the use of certain accounts. There was a $1.9 million balance. The rest was gone. So, do you contend on your timeline that you've lost that $1.9 million? Your Honor, I think it's a question of damages. The total loss was mitigation. The total loss was $10 million. Whether or not InCom can go recover that money back is a question between it and Bancorp and ultimately a question of damages. The total loss as a result of this was the money transferred out over $10 million over the policy limits. The fact that $1.9 million now remains as a result of InCom's ability to hold some of those accounts in its role as program manager is a question of damages or maybe the total amount of loss or maybe mitigation, but certainly not a question of coverage. But that's just – I mean, isn't that just sort of loss in the air? That's not really a real loss to you if the $1.9 million is just sitting there waiting on you to come get it? Well, Your Honor, I'm not sure the record shows that it's just sitting there for us to go get it. That would be, as I said, a question between InCom and Bancorp. But even so, it goes to the total amount of the loss, the damages in this case, and not whether or not there's coverage for the activity. Or perhaps it's a question of mitigation, which is certainly a defense that Great American could raise, but not a question of whether or not there's actually coverage. On the issue of the occurrences, which was Your Honor's first question, the scenario that Counsel for Great American presented multiple things over 50 years, that's not what we're dealing with here. It was a humpf. All of a sudden, bang, Great American – InCom realized what had happened, and they worked immediately to fix it. Unfortunately, by the time they fixed the issue with the software, $10 million was out the door. But everybody who's looked at this case, from their own investigators to everyone else, has seen that, look, this all occurred, and this was one event for purposes of coverage. The cause was this use of the IVR in this fashion. Do companies, either your own company or companies in your company's business, have separate policies that cover losses resulting from product defect? Your Honor, my client is not in that business, so they would not. But there are certainly, and we cited in our briefs and at summary judgment below, cases from the product liability context. And in those cases, courts will look at the defect itself as the cause, as opposed to, well, it was defective for customer A, customer B, customer C, customer D. It's the broken lawnmower that is the cause, that caused hundreds of injuries, or the broken tire, whatever it might be. So, I mean, you understand, I think the reason I'm asking the question is that that actually makes sense to me in the product defect policy situation. It makes somewhat less sense here, and I don't want to characterize, mischaracterize the policy as a fraud policy. But this really isn't a policy that aims to cover losses resulting from product defects, where you might look at the defect itself as the cause. Instead, the cause here seems to me to be multiple individuals formulating fraudulent intents to steal the money. Your Honor, it is analogous. The broken lawnmower, in my hypothetical, in the product defense case, is the same as the IVR. It was the broken lawnmower that caused the injury, or the design defect is even better. It was the design that went out into all of these. Here, it's the IVR and the manipulation of the IVR and the simultaneous manipulation of the IVR that caused the fraud, excuse me, that caused the loss. Your Honor, I see my time is up. Thank you very much for your time today. Thank you both for your efforts. This court will be in recess until 9 a.m. tomorrow morning. Thank you. Thank you.